# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**
        **Plaintiff,**

v.                                                                           Criminal No. 2:14-cr-12

**JULIE ANN JOHNSON,**
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant Julie Ann Johnson's "Motion to Suppress Physical Evidence," filed on September 22, 2014. (Docket No. 25.) The Government filed its response on September 22, 2014. (Docket No. 26.) On September 29, 2014, came Defendant, in person and by counsel, L. Richard Walker, and the United States by its Assistant United States Attorney, Stephen Warner, for hearing on Defendant's motion. On October 3, 2014, Defendant filed a supplemental motion to suppress. (Docket No. 33.) The Government filed its objection to Defendant's supplemental motion on October 7, 2014. (Docket No. 34.)

### I. PROCEDURAL HISTORY

On February 19, 2014, a Grand Jury sitting in the Northern District of West Virginia returned an Indictment against Defendant, charging her with six (6) counts of methamphetamine-related violations. (Docket No. 1.) Defendant was arrested in the Southern District of Florida on June 24, 2014. On August 28, 2014, she was arraigned before the undersigned, at which time she entered a plea of "Not Guilty" to all counts. On October 3, 2014, counsel for Defendant filed a motion to continue the pretrial and trial in this matter. (Docket No. 29.) That same day, Chief United States District Judge John Preston Bailey granted the motion. (Docket No. 31.) Trial is scheduled to begin with jury selection on November 18, 2014.

## II. CONTENTIONS OF THE PARTIES

Defendant contends that all evidence seized from her residence on August 23, 2013, should be suppressed because:

1. The affidavit supporting the search warrant failed to establish a nexus between Defendant's conduct at Wal-Mart and her residence; and

2. The <u>Leon</u> good faith exception does not apply, and a <u>Franks</u> hearing should be held.

(Docket No. 25 at 6-12.)

In her supplemental motion, Defendant asserts:

1. The affidavit in support of the search warrant lacked probable cause because it failed to establish a nexus between the conduct at Wal-Mart and Defendant's residence in Elkins, West Virginia; and

2. The <u>Leon</u> good faith exception does not apply because:

   a. The affidavit included false and misleading information which was material and necessary to any finding of probable cause;

   b. The affidavit was so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable; and

   c. The magistrate issuing the warrant abandoned his judicial role by rubber stamping a bare bones affidavit.

(Docket No. 33 at 5-11.)

The Government opposes Defendant's motion to suppress, arguing that:

1. Defendant is not entitled to a <u>Franks</u> hearing;

2. Officers acted in good faith; and

3. The affidavit contains adequate probable cause.

(Docket No. 26 at 1.) The Government also objects to Defendant's supplemental motion "because it appears to contain the same arguments raised in her amended motion to suppress (document 25)

2

and motion to suppress (document 24)." (Docket No. 34.)

### III. STATEMENT OF THE FACTS

The undersigned heard the testimony of Corporal Tom Kessel of the West Virginia State Police; Jacob Hornick, a former Asset Theft Prevention Associate at Wal-Mart in Randolph County, West Virginia; and Corporal Allen Vanscoy of the Randolph County Sheriff's Department. The undersigned also admitted into evidence copies of: (1) the search warrant for Defendant's residence; (2) the affidavit supporting the search warrant; (3) the property receipt for all items seized during the search of Defendant's residence; (4) a Wal-Mart receipt from April 23, 2013; (5) an email from Randolph County Sheriff Brady; (6) the NPLEX search results for Craig Hensley; (7) the NPLEX search results for Defendant; (8) a redacted check from a bank account belonging to Mac A. Dingess; (9) a sealed copy of the unredacted Dingess check; and (10) the application, search warrant, and property receipt for the search of Craig Hensley's residence. (Docket No. 28-1 to -10.) During the hearing, the undersigned qualified Trooper Kessel as an expert in the field of methamphetamine investigations. The undersigned finds that all testimony is credible, and finds the following facts:

Jacob Hornick was employed by the Wal-Mart in Randolph-County as an Asset Theft Prevention Associate for approximately a year and a half. In that position, he was responsible for deterring retail theft. Mr. Hornick was employed in that position during April 2013. During that month, he interacted with Defendant on three separate occasions.

On April 13, 2013, Mr. Hornick observed Defendant conceal three (3) packs of lithium batteries in her purse when she was in the clothing department at Wal-Mart. Mr. Hornick followed Defendant past the points of sale and apprehended her at approximately 6:01 p.m. He then took Defendant to the Asset Protection Office to speak with her. Defendant was cooperative, and Mr.

3

Hornick recovered three (3) packs of lithium batteries from her. Each pack contained four (4) batteries. The packs of batteries were worth $29.49. Mr. Hornick called the police at approximately 6:05 p.m. Corporal Vanscoy arrived at Wal-Mart and met Mr. Hornick and Defendant in the Asset Protection Office. He issued Defendant a citation for shoplifting.

Three days later, on April 16, 2013, Mr. Hornick again saw Defendant at Wal-Mart. He knew it was Defendant from his interaction with her a few days prior. The video surveillance system captured Defendant and another female at a point of sale. Defendant purchased two (2) bottles of camping fuel. The other female attempted to purchase clothes and other precursors used to manufacture methamphetamine. Mr. Hornick recognized precursor items because of his education in the field of criminal justice. The female attempted to purchase the items using a check from a bank account belonging to a Mac Dingess; however, Mr. Dingess was not with them. Mr. Hornick advised the cashier not to accept the check. After the other female's transaction was denied, Defendant purchased two (2) bottles of starter fluid. Mr. Hornick did not call the police on that date.

Defendant was at Wal-Mart again on April 23, 2013. On that date, Mr. Hornick was following Defendant through the store. He observed her select Coleman fuel, a filter for a fish tank, clear plastic tubing for the filter, and cat food. Defendant purchased the cat food, tubing, and fuel at 2:43 p.m.; she left the filter at the store. Mr. Hornick followed Defendant out to the parking lot,. An off-duty officer asked him if he was following Defendant, and he replied "yes." Mr. Hornick observed Defendant enter a red Pontiac driven by a male. Subsequently, he used Wal-Mart's computer system to print a copy of Defendant's receipt. That same day, Corporal Talkington responded to Wal-Mart for an unrelated shoplifting complaint. Mr. Hornick gave Corporal Talkington a copy of Defendant's receipt and a description of the red Pontiac. He also showed

Corporal Talkington video evidence of the transaction and told him what had occurred during his prior two (2) interactions with Defendant at Wal-Mart.

Corporal Talkington returned to the sheriff's station and passed on the information he had gleaned from Mr. Hornick to Corporal Vanscoy. Corporal Vanscoy was familiar with Defendant from traffic stops and other law enforcement activities. He also received an email from Sheriff Mark Brady, sent on April 23, 2013 at 4:30 p.m. In that email, Sheriff Brady related that he had received a call from Sheriff Jonesse of Pocahontas County. Sheriff Jonesse had observed a female buying tubing "and all the ingredients for meth"[1] at Wal-Mart that day "at 1530 to 1600 hours." He saw her get into a red Pontiac. A Wal-Mart employee had advised him that the same individual had been at Wal-Mart the day before to make purchases. (Docket No. 28-5.)

Based upon the email from Sheriff Brady and the information obtained from Corporal Talkington, Corporal Vanscoy decided to run an NPLEX search on Defendant to see if she was actively purchasing pseudoephedrine. Although Corporal Vanscoy is not an expert in methamphetamine investigations, he has experience with methamphetamine laboratories from executing search warrants for the past five (5) or six (6) years. From that experience, he knew that lithium batteries, tubing, Coleman fuel, and pseudoephedrine are commonly used to manufacture methamphetamine. A search of NPLEX revealed that Defendant had purchased pseudoephedrine four times in February and March of 2013. Those purchases were made at three (3) different pharmacies; the purchases were made on February 13 and 15 and March 18 and 20, 2013. (Docket No. 28-7.)

---

[1] It is clear from the evidence that this statement attributed to Sheriff Jonesse by Sheriff Brady is an exaggeration and misleading at best.

Corporal Vanscoy also ran the registration for the red Pontiac that Defendant had entered upon leaving Wal-Mart earlier that day. The registration returned to a Mr. Craig Hensley. Corporal Vanscoy ran an NPLEX search of Mr. Hensley. That search revealed that Mr. Hensley had purchased pseudoephedrine three (3) times in 2013. Those purchases were made at three (3) different pharmacies; the purchases were made on February 8, March 21, and April 18, 2013. (Docket No. 28-6.)

From his past experience, Corporal Vanscoy was aware that the majority of items used to manufacture methamphetamine are often stored by individuals in their residences. At approximately 6:37 p.m. on April 23, 2013, he and Corporal Talkington applied to a state magistrate for a search warrant for Mr. Hensley's residence in Elkins, West Virginia, as well as Mr. Hensley's Pontiac Firebird. At approximately 7:20 p.m. that same day, they applied for a search warrant for Defendant's residence in Elkins. The facts contained in the affidavit for the search of Defendant's residence were as follows:

> [O]n April 13, 2013 at approximately 1810 hours, Cpl. A. G. Vanscoy did respond to Wal Mart, Elkins, Randolph County, WV, in reference to a shoplifting complaint. Upon arrival at this department store, Cpl. A. G. Vanscoy did observe a female identified as Jule Ann Johnson seated with store associates. This officer was informed by Asset Protection Associate, Jacob Hornick, that he observed Johnson stealing (12) lithium batteries and did recover the mentioned items. Cpl. A. G. Vanscoy did issue Johnson a citation for Shoplifting and did recover and package the batteries as evidence.
>
> On April 23, 2013 at approximately 1600 hours, Cpl. B. A. Talkington did respond to Wal Mart, Elkins, Randolph County, WV in reference to a shoplifting complaint. While at this location, Cpl. Talkington did receive information in the form of video and sales receipt indicating that Julie Ann Johnson did purchase airline tubing and Coleman Fuel from this store at approximately 1443 hours on this same date. This information was obtained from Asset Protection Associate, Jacob Hornick. Hornick also stated to Cpl. Talkington that Johnson did proceed to enter a red Pontiac with a large spoiler fin on the rear and T-tops being driven by a male subject with a WV registration 3TE998.

> That registration did return to Craig Hensley with an address of 234 Diamond Street, Elkins, Randolph County, WV. Cpl. Talkington did travel to this address and did observe the above described vehicle parked directly in front of this address.
>
> An email from Sheriff M. T. Brady to all deputies was obtained that indicated Sheriff Jonesse from Pocahontas County, WV did observe the above described activities at Wal Mart on this date.
>
> On this date, Cp. A. G. Vanscoy did complete a Nplex search on Johnson and Hensley. The search result did indicate that Johnson and Hensley have been actively purchasing pseudoephedrine based products during March and April of this year.
>
> On this date, 220 2nd Street, Apartment 305, Elkins, Randolph County, WV has been reported to the below signed officers by EPD Senior Patrolman B. D. Tice as being the residence of Julie Ann Johnson.

The affidavit supporting the search of Mr. Hensley's residence was substantially identical and only omitted the paragraph regarding Defendant's residence. A magistrate for Randolph County granted both search warrants. (Docket Nos. 28-1, 28-2, 28-10.) The warrant and affidavit for Defendant's residence were received by the magistrate at 7:20 p.m. on April 23, 2013. (Docket Nos. 28-1, 28-2.) The warrant and affidavit for Mr. Hensley's residence were received by the magistrate at 6:38 p.m. on April 23, 2013. (Docket No. 28-10.)

The search warrant for Defendant's residence was executed on April 23, 2013, at 10:06 p.m. Officers seized, *inter alia*, several bottles containing white powder, empty battery packs, documents with instructions on manufacturing methamphetamine, ice compresses, clear tubing, pseudoephedrine, coffee filters, and drug paraphernalia. (Docket No. 28-3.) The search warrant for Mr. Hensley's residence was executed on April 24, 2013, at 6:33 p.m. (Docket No. 28-10 at 4.)

## IV. ANALYSIS

### A. Sufficiency of the Search Warrant

The Fourth Amendment to the United States Constitution provides that "no [w]arrants shall

issue, but upon probable cause, supported by [o]ath or affirmation." U.S. Const. amend. IV. To comply with the Fourth Amendment, the affidavit supporting the application for a search warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause" based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 238-39 (1983); see also United States v. Chandia, 514 F.3d 365, 373-74 (4th Cir. 2008) ("Because we give 'great deference' to a magistrate's probable cause decision, our review is limited to determining whether there was 'a substantial basis for the [magistrate's] decision.'") (quoting United States v. Hurwitz, 459 F.3d 463, 473 (4th Cir. 2006)). "The sufficiency of a search warrant and its supporting affidavit is reviewed *de novo* to determine whether a 'substantial basis' exists for the magistrate judge's decision." United States v. Oloyede, 982 F.2d 133, 139 (4th Cir. 1992). However, "[w]hen reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996)

The Supreme Court has described probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. "[T]o establish probable cause, the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." United States v. Williams, 972 F.2d 480, 481 (4th Cir. 1992) (per curiam) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). To meet this standard, the affidavit supporting the application for a warrant must make clear to a reasonable person "that there is some nexus between the items to be seized and the criminal activity being investigated." Doe v. Broderick, 225 F.3d 440, 451 (4th Cir. 2000.) The Fourth Circuit has noted that "the nexus between the place to be searched and the items to be seized

8

may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988). "[T]he crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993). Furthermore, when inaccurate, improper, or otherwise tainted evidence is used to obtain a search warrant, the warrant will not be invalid so long as there is enough untainted information to support probable cause. See, e.g., United States v. Clenney, 631 F.3d 658, 666 (4th Cir. 2011); United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993); United States v. Gillenwaters, 890 F.2d 679, 681-82 (4th Cir. 1989).

Upon review of the search warrant and its supporting affidavit, the undersigned agrees with Defendant that the facts presented failed to establish a connection between Defendant's residence and the items to be seized. As noted above, such nexus "may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." Anderson, 851 F.2d at 729. The Fourth Circuit's "precedent does allow a judge to make reasonable inferences that people store contraband in their homes." United States v. McKenzie-Gude, 671 F.3d 452, 459 n.2 (4th Cir. 2011) (citing United States v. Grossman, 400 F.3d 212, 217-18 (4th Cir. 2005)). However, the Fourth Circuit has "never held that a judge can make such an inference absent *any* facts in the affidavit linking a person to a residence." Id.; see also United States v. Williams, 548 F.3d 311, 321 (4th Cir. 2008) (applying good faith exception when affidavit included "bare assertions that the targeted dwellings were [the defendants'] current residences").

Here, the affidavit supporting the warrant to search Defendant's residence did state that Corporals Vanscoy and Talkington did learn the location of Defendant's residence from Senior

9

Patrolman B. D. Tice. (Docket No. 28-2 at 2.) However, that is the only reference to Defendant's residence contained in the affidavit. Nowhere in the affidavit are Defendant's purchases at Wal-Mart linked to her residence. For example, on April 23, 2013, Defendant purchased tubing and Coleman fuel from the Wal-Mart in Randolph County. After she made the purchase, Mr. Hornick observed Defendant enter a red Pontiac being driven by Mr. Hensley. Later that day, Corporal Talkington observed the red Pontiac outside of Mr. Hensley's residence. (Id.) The affidavit does not allege any connection between the April 23, 2013, purchase and Defendant's residence, nor does it allege any connection between Defendant's attempted theft of lithium batteries from Wal-Mart on April 13, 2013, and her residence. While the corporals did state that Defendant was an active purchaser of pseudoephedrine, her last purchase occurred on March 20, 2013, a little over one month prior to completion of the affidavit. Likewise, no connection between those purchases and Defendant's residence was alleged. Indeed, at the hearing held on September 29, 2014, Corporal Vanscoy admitted that there was no actual evidence that Defendant's residence was involved.

In the Fourth and other Circuits, "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." Lalor, 996 F.2d at 1583 (collecting cases). "Where no evidence connects the drug activity to the residence, the courts have found the warrant defective." Id. Given that Defendant's activity on April 23, 2013 pointed towards a connection with Mr. Hensley's residence, the Court finds that it would have been too speculative for the State magistrate to infer that precursors for manufacturing methamphetamine would be found in Defendant's residence. See McKenzie-Gude, 671 F.3d at 459 n.2. Accordingly, because of the lack of a nexus between Defendant's residence and the items to be seized, the undersigned finds that the warrant is invalid, and the "search will be insulated only if an exception

to the warrant requirement applies." Lalor, 996 F.2d at 1583.

B.   **Leon Good Faith Exception**

The exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 348 (1974). In United States v. Leon, 468 U.S. 897, 926 (1985), the Supreme Court held that a "good faith" exception to the exclusionary rule exists. As the Supreme Court reasoned:

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are included to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

Id. at 915. Furthermore,

> if the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

Id. at 918. The Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 922. Therefore, the question of whether the good faith exception should apply depends on whether suppression of the evidence would have the desired effect of deterring police misconduct. In most cases, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter." Id. at 920-21.

The Fourth Circuit has also provided commentary on the good faith exception:

> Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."

Lalor, 992 F.2d at 1583 (quoting Leon, 468 U.S. at 926); accord United States v. Bynum, 292 F.3d 192, 197-99 (4th Cir. 2002) (applying good faith exception where "affidavit contained sufficient indicia of probable cause so as not to render reliance on it totally unreasonable"); United States v. Clutchette, 24 F.3d 577, 581-82 (4th Cir. 1994) (applying good faith exception to search warrant issued by state judge over telephone). There are four situations in which an officer's reliance on a search warrant would not be reasonable:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;
>
> (2) the magistrate wholly abandoned his detached and neutral judicial role;
>
> (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

United States v. Hyppolite, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting Leon, 468 U.S. at 923). The proper test of an officer's good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23. This objective test requires a determination of the knowledge of a reasonable officer, not an examination of the officer's subjective motives. Clutchette, 24 F.3d at 582; United States v. George, 972 F.2d 1113, 1123 (4th Cir. 1992).

In her motion and supplemental motion, Defendant asserts that the affidavit "was so lacking

in indicia of probable cause as to render official belief in its existence entirely unreasonable." (Docket No. 25 at 10; Docket No. 33 at 8.) Specifically, in her supplemental motion, Defendant argues as follows:

> The Affidavit required speculation and conjecture in order for one to conclude that Ms. Johnson's home was somehow involved. The facts set forth in the Affidavit made it clear that the production of methamphetamine may have been occurring inside Craig Hensley's residence on April 23, 2013. It made sense that the police applied for a search warrant for Hensley's residence.
>
> On the other hand, at the hearing on September 29, 2014, the affiant, Deputy Vanscoy, admitted that there was no actual evidence indicating that Johnson's home was involved. This shows that the affiant was aware of the obvious deficiency in the search warrant. The Affidavit barely touches upon Ms. Johnson's residence, other than to say she lived there. All of the police involved should have been fully aware of the deficiencies of the Affidavit. The problem is not a technical legal deficiency. The Affidavit simply does not say very much about what may or may not have been going on inside Ms. Johnson's home on April 23, 2013.

(Id. at 8-9.) Defendant cites United States v. Herron, 215 F.3d 812 (8th Cir. 2000), in support of her argument. (Id. at 9.)

> The facts in Herron, as cited by the Eighth Circuit, are as follows:
>
> On August 31, 1998, the Circuit Court of Harrison County, Missouri, issued a search warrant for Mr. Herron's residence. The search-warrant application was supported by the affidavits of Agent William Lenhart of the Missouri Conservation Department, and Trooper Donald Tyes of the Missouri Highway Patrol. Mr. Herron plays only a small part in these affidavits, which are primarily concerned with officer's investigation of marijuana cultivation by his relatives, the Bucks, on a nearby farm. Agent Lenhart's affidavit stated that during a poaching investigation, he learned from a Kentucky conservation officer that Tommie Neil Buck (whom we shall call Buck, Jr.), a poaching suspect, was also under suspicion in Kentucky for marijuana cultivation. Lenhart attempted to deliver poaching citations to Buck, Jr. at his listed residence, a trailer located on a farm owned by him and his father, Tommy H. Buck (Buck, Sr.). No one was home. In April, 1998, Lenhart delivered the citations to Buck, Jr. at Mr. Herron's farm. Buck, Jr. told Lenhart that he was staying at the Herron residence to harvest corn. On July 23, 1998, Lenhart notified Trooper Tyes that Buck, Jr. might be involved in the cultivation of marijuana.
>
> Trooper Tyes's affidavit stated that on July 24, 1998, he and Agent Lenhart searched

13

an open portion of cornfield on the Buck farm but did not locate any marijuana. Subsequent searches, however, uncovered hundreds of marijuana plants on the Buck farm, hidden between rows of corn. Tyes contacted the Kentucky State Police, who indicated that the Bucks had a history of cultivating marijuana and that Buck, Jr., was currently under a 1996 indictment for cultivating marijuana. The Kentucky State Police also told Tyes that Mr. Herron was a relative and an associate of Buck, Sr., and that Mr. Herron had two previous convictions for cultivating marijuana in Kentucky, in 1984 and 1996. Based on these facts, his seventeen years of experience as a patrolman, and his involvement in numerous drug investigations, Trooper Tyes concluded that marijuana and the implements of marijuana production would be found at the Herron residence.

The Prosecuting Attorney of Harrison County reviewed and submitted these affidavits with an application for a search warrant for the Herron residence. At the same time, she submitted an application for a search warrant for the Buck farm. The same affidavits were offered to support both warrant application; only the name of the occupant and the descriptions of the residences to be searched varied.

Id. at 813-14. Judge Fenner of the United States District Court for the Western District of Missouri adopted a Magistrate Judge's recommendation that Leon's good faith exception apply and denied Herron's motion to suppress. Id. at 813.

The Eighth Circuit reversed the District Court's judgment and remanded for further proceedings. Id. at 815. In so doing, the panel stated that the "affidavits provide no evidence that there was any illegal activity at the Herron residence and no evidence that Mr. Herron ever participated in the cultivation of the marijuana found at the Buck farm." Id. at 814. Furthermore, the panel opined:

Moreover, we think that the officers involved should have been fully aware of the deficiencies of their affidavits. The problem is not a technical legal deficiency; the affidavits simply do not say very much about Mr. Herron or his residence. The officers' affidavits were originally prepared to support a search-warrant application for the Buck farm. On this subject, they are focused, complete, and quite probative. By contrast, the affidavits barely touch on the Herron residence or Mr. Herron and then only in a way incidental to the Buck investigation. While the same affidavit can support probable cause at more than one location, here the affidavits were designed to support a search warrant for the Buck farm and applied to the Herron residence as an afterthought. Under these circumstances, we think that the lack of probable cause

14

in the affidavits would have been apparent to reasonable officers. In reaching this conclusion we are mindful that the subject of this search–a person's home–enjoys special protection under the Fourth Amendment.

Id. at 814-15.

More recently, Judge Friedman of the United States District Court for the District of Columbia relied on Herron to grant a defendant's motion to suppress. See United States v. Johnson, 332 F. Supp. 2d 35, 42-43 (D.D.C. 2004). In Johnson, an officer of the Metropolitan Police Department ("MPD") completed an affidavit for a search of 522 F Street, N.E., in Washington, D.C. Id. at 36. The affidavit was based upon an incident that had occurred between a Mr. Tyrone Oliver and an individual identified as "Ross." Id. at 37. The MPD's database stated that Oliver's address was 522 F Street, N.E., and the officer received confirmation of this from the Court services Offender Supervision Agency. Id. When executing the search warrant on August 11, 2003, officers observed defendant Johnson in the basement leaving a bedroom. Id. at 38. The officers stopped Johnson and searched the room. In that room, they located an open bag that continued two handguns and ammunition. Id. Johnson was indicted for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Id.

> In granting Johnson's motion to suppress, Judge Friedman stated:
>
> The affidavit in the instant case was so deficient that a reasonable officer's belief in the existence of probable cause was unreasonable. The affidavit insufficiently linked the suspect, Tyrone Oliver, with the place to be searched. It failed to state that Mrs. Ross or anyone else actually told the officer that Oliver lived there or had stayed there. It failed to explain why the officers believed they would find Oliver's gun or other evidence incriminating Oliver at that residence nearly four weeks after the July 12 incident and even longer after there was any evidence of Mr. Oliver's connection to the address in question.
>
> . . .
>
> [I]n this case the affidavit provides no evidence of a recent connection between Mr.

15

> Oliver and 522 F Street, N.E. and no basis at all to believe that a gun would be found at 522 F Street, N.E. The most that can be said for the affidavit here is that it contains a handwritten statement that Ross "was staying with his mother, who lives across the street from Mr. Oliver," Affidavit at 1, and that two databases confirmed that Mr. Oliver *at one time* listed 522 F Street, N.E. as his address of record. Officer Jackson suggested that Mrs. Ross provided the information he added by hand to the affidavit and testified that an agent of one of those agencies had reported that someone had told that agent more than a month earlier that Mr. Oliver had stayed at that address. Neither of these facts, however, appears in the affidavit. In fact, the affidavit includes no statement as to who, if anyone, told Officer Jackson that Mrs. Ross lived across the street from Oliver and includes no reference to the currency of either the MPDC database listing or the confirmation provided by CSOSA. While Officer Jackson may have suggested at the suppression hearing (his testimony is unclear on this point) that it was Mrs. Ross who told him that Oliver's mother lived across the street from Mrs. Ross and that Mr. Oliver was staying there, the crucial point is that the affidavit itself does not identify Mrs. Ross or anyone else as the source of this information. With no facts as to the currency, reliability or source of the address information, the officers could not reasonably have believed that the affidavit provided sufficient indicia of probable cause to believe that Mr. Oliver currently resided at 522 F Street, N.E.

Id. at 39, 41.

The undersigned does note that in a recent case in this Court, United States District Judge Irene M. Keeley stated as follows:

> Even where the affidavit fails to provide a demonstrated nexus between the location to be searched and the defendant's criminal activity, the *Leon* good faith exception is still applicable. . . . Given the "reasonable inference [] that people store contraband in their homes, . . . the officers' good faith belief that [Defendant] stored his marijuana plants at his residence is not unreasonable. As such, even if the affidavit in this case is deficient for failing to explicitly establish a nexus between the criminal conduct and the defendant's residence, it "is not so lacking in probable cause that the officer's reliance on it was objectively unreasonable."

United States v. Hurst, No. 1:12-cr-19, 2012 WL 3079250, at *3 (N.D. W. Va. July 30, 2012). The affidavit at issue in Hurst stated as follows:

> On August 12, 2011, at approximately 2130 hours the undersigned officer and Child Protective Service Worker Jondrea Nicholson went to a residence on a child welfare check. The allegations in the CPS Referral were that there was marijuana use in the residence in front of underage kids. Upon our arrival at the residence, the

16

undersigned officer made contact with the individual that was named in the referral. The undersigned officer advised this individual that if there was any drugs/paraphernalia or any illegal substance in the residence, it needed to be turned over to the undersigned officer at this time. The individual went to the living room area and got a bag of a green leafy substance, verbalized by the individual to be marijuana. Also given to the undersigned officer was a glass pipe used for smoking marijuana and a silver in color grinder used to grind marijuana. The undersigned officer asked the individual where the marijuana was obtained. It was disclosed to the undersigned officer and CPS Nicholson that another person living it the house had bought it. The individual disclosed to the undersigned officer that they buy the marijuana from Jimbo Hurst. It was also disclosed to the undersigned officer that they also buy leafs [sic] off of Jimbo's plants. The undersigned officer then asked where Mr. Hurst lives. It was disclosed to the undersigned officer that Mr. Hurst lives on Route 18 South past the horse farm on the left.

United States v. Hurst, No. 1:12-cr-19, 2012 WL 3089743, at *2 (N.D. W. Va. June 22, 2012).

The undersigned finds that Hurst is distinguishable from Defendant's case. Hurst only involved the issuance of one affidavit, not like Defendant's matter, where two substantially similar affidavits were submitted to the State magistrate to obtain warrants to search two separate residences.

Rather, the undersigned finds that Defendant's case is substantially similar to the matter presented to the Eighth Circuit in Herron. Like in Herron, the affidavit seeking a warrant to search Defendant's residence was identical to the affidavit seeking a warrant to search Mr. Hensley's residence and vehicle, with the exception of the paragraph stating where Defendant's residence was located. See Herron, 215 F.3d at 814 n.1. As noted above, the State magistrate received the affidavit seeking a warrant for Mr. Hensley's residence and vehicle on April 23, 2013, at 6:37 p.m. (Docket No. 28-10.) Approximately forty-five (45) minutes later, at 7:20 p.m., the State magistrate received the affidavit seeking a warrant for Defendant's residence. (Docket No. 28-2.) The undersigned agrees that the "same affidavit can support probable cause at more than one location." Herron, 215 F.3d at 815. Here, however, the affidavits noted that on April 23, 2013, Defendant purchased airline tubing and Coleman fuel from Wal-Mart. Mr. Hornick then observed Defendant enter a red Pontiac

17

being driven by a male. That vehicle was registered to Mr. Hensley. Later that day, Corporal Talkington traveled to Mr. Hensley's residence and observed the red Pontiac outside of this residence. Given these facts, like in Herron, the affidavits here were designed to support a warrant for Mr. Hensley's residence and vehicle and applying them to Defendant's residence "as an afterthought." Id. The only reasonable inference the officers could make from the fact of Defendant buying the tubing and Coleman fuel and then getting into the Hensley Pontiac and seeing that Pontiac in front of Hensley's residence is that Defendant took the tubing and Coleman fuel to Hensley's residence.

By contrast, the only reference to Defendant's residence was that Senior Patrolman B. D. Tice had told Corporals Vanscoy and Talkington that 220 2nd Street, Apartment 305, was Defendant's residence. There was no mention of how Senior Patrolman Tice was aware of Defendant's residence, nor was there any corroboration of that statement. In sum, the undersigned concludes that the affidavits simply provided no evidence that there was any illegal activity occurring at Defendant's residence and the officers had no basis to infer that there was. Under these circumstances, the undersigned believes "that the lack of probable cause in the affidavits would have been apparent to reasonable officers." Id.

## V. CONCLUSION

In sum, the undersigned finds that the lack of a nexus between Defendant's residence and the items to be seized renders the search warrant invalid. The undersigned further finds that the Leon good faith exception does not apply because the search warrant was supported by an affidavit "so lacking in indicia of probable cause as to render official believe in its existence entirely unreasonable." Leon, 468 U.S. at 923. Given these findings, the undersigned declines to address

18

Defendant's arguments that the magistrate who issued the search warrant abandoned his judicial role and that the affidavit contained knowing and reckless false statements.

## VI. RECOMMENDATION

For the reasons stated herein, it is **RECOMMENDED** that Defendant's "Motion to Suppress Physical Evidence" (Docket No. 25) and "Supplemental Motion to Suppress Physical Evidence" (Docket No. 33) be **GRANTED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 9th day of October, 2014.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE